IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

UNITED STATES OF AMERICA

VS.                                          4:92-CR-00252-01-JM

CHARLES BRUCE NABORS

## ORDER

For the reasons set out below, Defendant's Motion for Compassionate Release and Addendum (Doc. Nos. 407, 408) are DENIED.

**I.   BACKGROUND**

On August 20, 1996, a jury found Defendant guilty of RICO violations which included the robbery and kidnaping of Bill Anderson; the robbery of Donna Johnson; interstate transportation of stolen property; the attempted robbery of the Woodland Bank in Tulsa, Oklahoma; the kidnaping of George Foster and Karen Fisher Perkins; wire fraud; and the robbery and kidnaping of Vandy S. Gavin. He was also convicted of conspiracy to commit extortion and robbery; interstate transportation of stolen jewelry; mail and wire fraud; being a felon in possession of a firearm; and possession of a stolen firearm.[1] On April 30, 1997, he was sentenced to life in prison.[2]

**II.   DISCUSSION**

Although the First Step Act made the procedural hurdles for compassionate release a bit less strenuous, a defendant still must establish "extraordinary and compelling reasons" and that release would not be contrary to the 18 U.S.C. § 3553(a) factors.[3]

---

[1]Doc. No. 296.

[2]Doc. No. 345.

[3]18 U.S.C. § 3553(a)(2) mandates that any sentence imposed reflect the seriousness of the offense, afford adequate deterrence, protect the public, and provide the defendant with appropriate rehabilitation.

Before a Defendant may seek compassionate release under the First Step Act, he must first make the request with the Bureau of Prisons and exhaust his administrative remedies there.[4] Defendant requested compassionate release on December 25, 2020, and that request was denied. It is not clear whether Defendant appealed the denial. However, I will assume he has exhausted his administrative remedies and that the issue is properly before this Court.

Defendant seeks compassionate release because he asserts that his atrial fibrillation and his age–he will turn 67 years old this month–put him at a higher risk if he contracted COVID-19. The Court finds that these health condition are not "extraordinary and compelling" reasons warranting Defendant's release. Although the First Step Act did not define this phrase, it defers to the United States Sentencing Guidelines, which does set out examples[5]; Defendant's health conditions are not listed. While the Center for Disease Control and Prevention ("CDC") does caution that adults over the age of 65 are more likely to get severely ill from COVID-19, atrial fibrillation is not listed as a medical condition that places individuals at an increased risk of becoming seriously ill from COVID-19.[6] Defendant has provided no argument or evidence that his health conditions cannot be controlled with medication or that they prevent him from

---

[4] See *United States v. Smith*, Case No. 4:95-CR-00019-LPR-4, Doc. No. 440 (E.D. Ark. May 14, 2020) (no jurisdiction when defendant fails to exhaust administrative remedies).

[5] Of course, this list predates the COVID-19 outbreak. U.S.S.G § 1B1.13 cmt. n. 1. The examples are: (1) the defendant's medical condition is such that he suffers from a "terminal illness" or the condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; (2) "[t]he defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less; (3) the defendant's family circumstances include either "(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children" or "(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner."

[6] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

independently functioning within the prison. Additionally, the Court notes that Defendant declined to receive the vaccine because he is on blood thinners, but studies have not show a known serious risk when getting a COVID-19 vaccine while on blood thinners.[7]

Defendant also attacks the legality of his conviction and his sentence, but those issues have already been adjudicated.

Even if Defendant could establish extraordinary and compelling reasons based on his medical conditions and the conditions at the prison, his request for relief must be denied because of the § 3553(a) factors – specifically, protecting the public from additional crimes by Defendant and reflecting the severity of the offense. Defendant has prior convictions for theft and armed bank robbery, which involved the same conduct as the instant offenses. Additionally, Defendant started committing the instant offenses only a month after being release on parole after serving over six years for his armed bank robbery conviction.

The severity of the instant offense also must be considered. The Court of Appeals for the Eight Circuit summarized the facts of Defendant's convictions as follows:

> The events involved in this prosecution commenced following Nabors' release from federal custody on parole in November 1990. In December 1990, Fern Kilgore's Ford Bronco was stolen. Kilgore's Bronco was rammed into a Radio Shack store during a burglary in January 1991. Billy Keltner, Keltner's brother, admitted his participation and implicated Nabors in the burglary of the Radio Shack store during an interview on February 25, 1991 with Federal Bureau of Investigation (FBI) agents and other law enforcement officials. Several compatible walkie-talkies and police scanners were stolen from the store. A police scanner guide of the brand sold exclusively by Radio Shack was later recovered by law enforcement from Keltner's car. Billy Keltner stated that Nabors did not find the specific type of microphone he wanted in the Radio Shack store so they burglarized a second store, where Nabors obtained the type of microphone for which he was looking. The internal components of one such microphone were identified as similar to the microphone used on a hoax bomb device involved in an extortion and robbery attempt of the Woodland Bank in Tulsa,

---

[7]https://www.firstcoastheart.com/wp-content/uploads/2021/03/Chronic-Condition-Blood-thinner-vaccination-Approval-03.03.21.pdf

Oklahoma. The items stolen from Radio Shack and the second store were similar to the items used in several subsequent crimes of which Keltner and Nabors were convicted.

The jury found Nabors and Keltner guilty of the January 1991 robbery and kidnaping of Bill Anderson. During the FBI interview on February 25, 1991, Billy Keltner admitted he participated in this crime. Anderson's description of the crime during his trial testimony coincides with Billy Keltner's description given to the FBI. The items stolen from Anderson included guns, cash, jewelry, a *666 photograph of Keltner's sister and a vehicle. Some of these items, including the vehicle and a gun, were later recovered by Anderson. The stolen jewelry had a value of between $21,000 and $22,000. Anderson identified Nabors at trial as one of the perpetrators of the robbery and kidnaping.

The jury also found Nabors and Keltner guilty of the January 1991 robbery of Donna Johnson. The items stolen from Johnson included jewelry valued at $241,000, firearms, a camera, cash and a Cadillac. Johnson's Cadillac was later recovered. Billy Keltner admitted his participation in this crime to the FBI. Johnson testified at trial regarding the details of the robbery in her home. Billy Keltner's descriptions of the crime and the jewelry taken (including a Rolex watch) are almost identical to Johnson's trial testimony.

* * *

The jury found Keltner and Nabors guilty of conspiracy to commit extortion and robbery of the Woodland Bank in Tulsa, Oklahoma (Tulsa bank robbery). The jury also found the Tulsa bank robbery was a racketeering act under the RICO count. Viewing the evidence most favorably toward the guilty verdict . . . the record reveals the following facts. Bill Foster, President and CEO of Woodland Bank, and Karen Fisher Perkins, Senior Vice President and Controller of Woodland Bank, were kidnaped by the defendants. Although Foster was not absolutely certain, he testified at trial he believed Keltner was the driver of the van involved in the crime and Nabors was the man in charge during the commission of the crime. Although Perkins had not identified Keltner or Nabors during lineups prior to trial, she identified Keltner during the trial as the driver of the van and Nabors as the man in charge. In addition, Nabors and Keltner admitted their participation in the Tulsa bank robbery (and some of the other burglaries and robberies discussed above) to several different individuals.

Defendants placed a device on Foster's car which was triggered to stop the car's engine. On June 14, 1991, Foster's car's engine stopped and could not be restarted.

Foster arranged for Perkins to give him a ride to work that morning. As Perkins was driving them to work, a van bumped into the back bumper of Perkins' car. Foster got out of the car to survey the damage. Nabors approached Foster with a gun and directed Foster to return to Perkins' car. Nabors got in the back seat of Perkins' car

4

and directed Perkins to drive to a parking lot near the Woodland Bank. The van followed them to the parking lot.

Upon arriving in a parking lot, Nabors directed both Perkins and Foster to move to the van. Nabors ordered Foster to retrieve $1 million from the Woodland Bank. Foster informed the defendants the bank did not have $1 million cash on hand and the bank vault would not open for another 30 minutes. One of the defendants stated he knew the bank had $3.7 million. The most recent Statement of Condition of the Bank indicated the bank had $3.7 million in cash due from other banks. An employee of the bank testified that she believed Nabors came into the bank approximately one week prior to the Tulsa bank robbery and requested a copy of the Statement of Condition. The employee testified Nabors did all of the talking and a second man (younger than Nabors), dressed in white painters' pants, was with him. The employee did not identify the second man. Terry Leach and Darla Leach testified that Nabors and Keltner were in Oklahoma approximately one week prior to the Tulsa bank robbery. Darla Leach testified that Keltner was wearing white painters' pants during this visit to Oklahoma.

Following a discussion with Keltner about Foster's statement that the bank did not have $1 million in cash on hand, Nabors decided to have Foster retrieve all of the cash in the possession of the drive-up tellers. Nabors fastened a metal box with a cable around Foster's body and told Foster it was a bomb. Nabors told Foster to return to Perkins' car with the money and follow the map contained in the trunk of the car.

Foster entered the Woodland Bank and immediately called the FBI. The device placed on Foster was later found to be a microphone which allowed the defendants to hear what Foster was saying after he entered the bank. While Foster was driving to the bank, Keltner drove the van to a second parking lot where Nabors and Keltner ordered Perkins to transfer to a brown car. Once they were in the brown car, Perkins could hear Foster's voice on a two-way radio possessed by Nabors. When Nabors and Keltner heard Foster call the police, their attempt to start the car failed. Perkins escaped out the back door, flagged down a car and was given a ride to the bank.[8]

## CONCLUSION

For the reasons stated, Defendant's Motion for Compassionate Release and Addendum (Doc. Nos. 407, 408) are DENIED.

IT IS SO ORDERED, this 3rd day of May, 2021.

_____

---

[8] *United States v. Keltner*, 147 F.3d 662, 665-667 (8th Cir. 1998).

UNITED STATES DISTRICT JUDGE